May it please the Court, we're here today to discuss the unique challenges in the art of wild boar trapping. Solved by Jager Pro's patented MIND smart trap invented by military veteran Rod Bingham. The board here committed reversible error using classic hindsight bias to gap-filled what the fire art did not quote-unquote exclude. Meanwhile, ignoring a powerful stack of objective evidence showing non-obviousness of the patent invention, which has been praised in the industry as a major technological advancement in this field. Also referred to as Corral Trap 2.0. The board's findings are not based on substantial evidence or the correct legal standard. What functional or structural limitation would you say is missing from the prior references, in your view? Yes, Your Honor. There are at least three claim elements missing, and those include structure and function. One, wireless detection system. Two, wireless detection within the trap enclosure. And three, wireless control signal. Wireless isn't new, is it? Wireless is in Voorhees, at least? Your Honor, wireless communications in Voorhees was taught. However, there was no teaching of wireless control or detection of the animal with the trap in Voorhees. It was merely to exchange simple data information, such as the trap trigger status and environmental data. There's no teaching in Voorhees that comes even close to describing actually controlling the trap or detecting the animal, is all of the disclosures. But you would agree that wireless, it's a technology that existed in the art at the time of the invention? Your Honor, Jaeger Pro does not dispute that wireless, generally the concept was known. However, it's particularly implemented... What about a wireless monitoring camera? Same thing. Motion detectors were also well known in the art, correct? Yes, the critical issue in this case, Your Honor, is the combination of these known elements in a relatively simple technology that in the face of the long time that had passed between the prior art and the patented invention, and most importantly, the commercial success and other secondary or objective indicia of non-obviousness, guard against the hindsight that this court has warned about doing for such relatively simple technologies. So, I guess just moving to Zhang, why was it unreasonable for the board to read the Zhang reference as teaching, disclosing that the remote control unit is receiving a signal from the transmitting unit wirelessly? And likewise, the remote control unit is sending a control signal back to the capture unit, capture control system wirelessly. It shows these broken lines with arrows. It specifically talks about its remote control unit as being remote, something far away, something where a person, a user, can be remote from the trap. So, why doesn't all that lend to reaching a reasonable conclusion that what's going on here is that the remote control unit, like a lot of remote control units, is communicating wirelessly with other units? A couple of points in response to that question, Your Honor. First of all, there's nothing in Zhang that actually discusses wireless transmission of the transmission unit signal or the capture unit signal. You're correct that figure one, the sole figure in this very simple five-page patent reference, does have squiggly lines, but there's no objective evidence that that discloses wireless. Now, a petitioner or a police expert did opine that because it was far away, because the remote control unit would be far away from the site, that that would suggest to a fazita that it would be wireless. However, that's based on conclusory testimony, and there's actually contradictory record evidence cited by Jaeger Pro that shows, for example, in the Prior Art Reisman patent, that transmission, at that time, actually very well meant through coax cables and hardwired even to remote sites. Would not a person still in New York look at Zhang and say, it's practical to use wireless technology with this camera in the trap, as opposed to using wired technology? It's impractical? I mean, KSR talks about the person's skill in the art in terms of utilizing a practical ability. In this case, wouldn't it be impossible to stretch, what, miles of line from the trap to wherever the person is sitting? Certainly not impossible, Your Honor, and in fact... Impractical? Impractical, not necessarily. We have transatlantic optical fiber built throughout the world, and here, Apoli's own expert, whenever he, as a wildlife management researcher, would be out in the field, he never used any wireless detection or wireless cameras. During his depo, he testified that he wasn't aware of any studies that looked at that, and in fact, the prior art that's being modified here starts with the Texas boars combination of a rudimentary corral trap. So you're starting there, as a person of ordinary skill in art. There's record evidence that shows those corral traps were intended to be left alone and just set, and passively allowed for the pigs to be trapped with a trip wire. But so you start there, and then you have to go to Jong, and then from Jong, which has a completely different trap, a suspension trap for a net or a cage hanging atop a pole or a tree, you would then have to combine those two different traps or the technologies with Jong and use wireless to do something that, frankly, had not been done. This is admittedly a novel patent in this industry. It had not been done for years. Despite petitioner Apoli claiming that these corral traps had been around since at least the 1800s, and that remote monitoring, not detection, but remote monitoring of such traps had been around at least since the 1980s, and then their prior art references all date back at the latest to 2007, when the patented claims here are entitled to a 2010 priority date. My understanding is the board agreed with the Apoli's theory of motivation to combine the Jong detection monitoring, the remote detection monitoring scheme with the Texas 4's corral, because it would be a simple substitution to replace the trip wire with the remote signal system of Jong. In addition to that, another motive would be you'd be able to basically better control the ability to capture more animals inside the corral, because you'd have someone in some remote location watching animals coming closer, and then being able to send the signal to shut the door. I guess the question is, again, you know, we just have to ask ourselves, is there substantial evidence to support those kinds of fact findings? And the question for us now is, why are those findings unreasonable to make in this situation? Understood, Your Honor, and I appreciate your question. The question is really one of whether the expert of Apoli is entitled to any weight, given it is entirely conclusory and not based on extrinsic evidence, or any other evidence, other than him saying that he would combine a suspension trap with a corral trap, even though there's record evidence that shows from the real party of interest, Noble Research Foundation, where they argued that corral traps are different from suspension traps, and one of their own researchers wrote an entire PhD thesis on why suspension traps were different from corral traps. But the more critical point that the board erred on, we believe, is that there is no teaching, suggestion, or anything, disclosure in the prior art, with respect to detection of animals within the enclosure. That is not in Zhang, that is not in Texas Boers, that is not in Voorhees. That may be true, but the question is, what do you get, what do you, what's the result when you combine the Zhang monitoring detection communication signal system with Texas Boers' corral? And where would you place the camera assembly, where would you place Zhang's camera assembly? You wouldn't place it, you know, 20 miles away from the corral, you would place it in a location where you could see what is going on inside the corral, and likewise, near the gate, so you could see, you know, the proximity of, are pigs coming closer to the corral, are they being somehow successfully lured into the corral, oh, now we've got four pigs in the corral, now we've got eight pigs in the corral, now we've got ten pigs, that's enough pigs, let's shut the door. I mean, that would be the resulting combination of Texas Boers and Zhang, wouldn't it? The only record evidence besides Appley's Conclusory Act for Testimony on that fact is the patents in suit. Well, the camera wouldn't be facing away from the corral, right? Zhang only discloses monitoring, monitoring, not detecting, the entire site, and it has a video capture unit and a separate capture unit, which is a trap. Those two units are shown in the figure to be separate, and they're both vaguely referenced to be atop a tree or a pole, but there's nothing in Zhang that instructs where the relative orientation or proximity of the video capture unit, which is where the animal approaches in Zhang, not the capture unit itself. And Zhang, again, teaches monitoring the entire site, not the trap enclosure, which is this much smaller than the trap. And therefore, there's nothing in the record besides Conclusory Ipsy-Dixit Expert Testimony. Thank you. I would just briefly direct the Court's attention to the TQ Delta and the Rendy cases on that last point I just made, where the Court requires more than Conclusory Expert Testimony to fill in a missing prior art element. Thank you. I'll reserve my time for a moment. May it please the Court. Scott Cummings for the appellee, and with me is my colleague, Anna Kim. I believe I can quickly summarize our positions in this appeal. The appellant's arguments, and there are many, fall into what is essentially three buckets. First, with respect to the features of the claims that the prior art allegedly fails to disclose or teach, the appellant's arguments are pretty much a textbook piecemeal attack on the prior art. And those arguments were rejected in the proceedings below, and I believe they should be rejected by this Court as well. Second, with respect to the arguments regarding the motivation to combine and a reasonable expectation of success, I think the record is clear that the references themselves, coupled with the petitioner's expert witness testimony, provide and explain the necessary motivations to combine and reasonable expectations for success. And lastly, with respect to the patent owner's secondary considerations arguments, the Board correctly analyzed all the evidence that was provided to it, and correctly determined that the patent owner had failed to make out a prima facie case that it was entitled to a presumption of the nexus. And specifically, the Board found that the patent owner had failed to establish the presence of the claimed control mechanism and its signal processing capabilities in the commercial product. And I believe that that type of analysis and critique of the expert witness testimony is the type of analysis that this Court affirmed in the Western GECCO decision. Are you saying that the Board must first have a prima facie case of obviousness before it can consider objective indicia of non-obviousness? Not entirely, Your Honor. It goes to the weight, right? So I believe that the nexus is required, the patent owner bears the burden. If it's asking for the benefit of the presumption of the nexus, then it has the initial burden to come forward with sufficient evidence to make out a prime facie case that the claim elements are embodied in the commercial product. I guess we're, maybe I'm a little confused when you invoke the term prima facie case, because, you know, in the context of 103, I'm customarily used to thinking of prima facie as the prima facie case of obviousness, not the prima facie case of nexus. So I think you meant to say presumption of nexus? Correct. Don't say prima facie case of the presumption. Just say presumption. Okay. Thank you, Your Honor. Yes. And that sort of leads us, I think, into the Polaris decision, which is cited and relied upon by the appellant as the basis for arguing that the board somehow committed legal error in this case. And I don't believe that Polaris compels a different result in this case. And Judge Lurie, you were on that panel, I believe, Polaris decision, so you would know better than me. But my reading of that case, the particular facts and the circumstances that this court was presented with compelled it to rule the way that it did. And those facts and circumstances are definitely not present here. And I can tick off a few distinctions. One distinction is that in this case, the board specifically identified those features of the claims that were not embodied in the commercial product. And in Polaris, that was not the case. The board simply dismissed the patent owner's evidence as conclusory. Another important difference is in Polaris, the patent owner's evidence of presumption of a nexus was not disputed by the petitioner or its expert. And in this case, there's a lot of dispute about the adequacy of the patent owner's evidence. And not only that, not only did the petitioner dispute it, their own expert's testimony contradicts their conclusion that they're entitled to a presumption of a nexus. And another distinction is in Polaris, the expert testified that they personally examined physical embodiment of the commercial product. And in this case, it's undisputed that the patent owner's expert never personally examined the product. And that was noted by the board in its decision. As you pointed out, their product didn't contain all the limitations of a claim.  By their own expert's testimony. They point to a manual, however. And say, oh, look at the figure in the manual. There's something going on here. It looks like a control box that's receiving a signal. So, with respect to the manual, they did cite the manual with respect to a different claim element than the claim element we're discussing here, which in the 1470 IPR, that's claim element 1E, is what the board found was missing. In the patent owner's response, they cited the manual, but they cited it for a different claim element. They cited it for 1D, not 1E. So, I would argue the board would have been within its rights to claim that was a new argument raised. Did they file a SIR reply? Yeah. Okay, well, what'd they say in the SIR reply? In the SIR reply, they pointed to the manual as evidence that claim element 1E, a different claim element, was in the commercial product. But the board considered that evidence and rejected it. And the board correctly found that that manual doesn't say what the patent owner claims it says. That manual contains no information about the processing capabilities of the control mechanism, the signal processing. No information is contained in that at all. So, the manual doesn't help fill in any gaps. It was relied upon for a different claim limitation in the patent owner's response. And importantly, it's not even the same version of the trap that they've argued is a commercial product in the YouTube video. If you look at the YouTube video, which was never admitted into evidence and never authenticated, but if you did look at that video, what you see is a description of the use of a cell phone by the user to trigger the trap, which is the display device in the claims. If you look at the manual, there is no such thing. There is no display device. It's a remote transmitter like a garage door opener. It's a long-range transmitter. There's no display device. It's not even the same model trap. And there's no evidence or discussion about it's the same features in common with the YouTube video. There's none of that. So, I don't believe that the manual helps their case. There's some other distinctions I could point to relative to Polaris. One of them is with respect to the 1471 IPR. In the patent owner's response, they represented that they were mapping Claim 1 of the 339 patent to the commercial product, but that's not what they did. They mapped Claim 1 of the 228 patent to the commercial product. Wrong patent. And additionally, in their patent owner's responses in both cases, they never cited their expert witness's testimony. They didn't rely upon any expert witness testimony in their patent owner's responses. They first referred to that in a cert reply. And again, I think the board would have been within its rights to say that was a new argument raised for the first time in a cert reply. They considered their evidence anyway. I think even with all of these issues and problems with their case and below, the board went out of their way to consider all of the evidence that they presented. And like I said, I believe the board would have been within its rights to refuse to do so. But with respect to that 1471 IPR, I would point out to the court that there is an additional finding of the board that the patent owner's evidence was inadequate because of this mistake with the claim in the patent owner's response. And even their petitioners, even the patent owner's expert in their declaration, and the patent owner's expert in the 1471 IPR did refer to the correct patent in the declaration. But even then, when it gets to the critical limitation of where this control mechanism is recited in the claims, the patent owner's expert misrepresented what the claim requires. It was completely wrong in the declaration. So even their expert in the 1471 IPR didn't map correctly the claim to the product. And again, the board recognized that in their decision, and yet they compared the expert's testimony to what the claim actually requires and found the same deficiency. So that's, you know, basically what I had to say about Polaris, and I'll spare Your Honors a long speech from me today. If there's any other issues you would like to discuss, I'm happy to discuss them with you. Well, we can't accuse you of clogging earlier. No one ever loses points by surrendering a time. Thank you, Mr. Cummings. Mr. Talcott has some public comments. Thank you, Your Honors. I will be brief, but Polaris is on all fours here in controlling. Jaeger Pro did far more than what was required by the expert in Polaris, where the expert submitted a six-page... six-paragraph declaration just saying he reviewed over ten different Razor ATV vehicle products and found them coextensive with the claims, and he just referenced the claims broadly. There was no claim element, no claim chart. The court found that in Polaris that this court precedent does not require more than that, does not require limitation by limitation analysis of coextensiveness as the board required improperly here, nor does it even require documentary evidence. All it required in that case was the expert's testimony. The manual here shows exactly the control box. It was formal refunction for the board to basically interpret the expert's imprecise, unfortunate language as far as where the control signal went to the control box, which is clearly shown in the video that he reviewed, which was part of his review of the product, and the Monsanto case says that that is completely acceptable. Expert testimony does not require first review. So Polaris is controlling, and we exceeded the requirements there. I'll just say in conclusion that... to invalidate a hard-working military veteran's patent as the board did here simply requires more rigor under this court's precedent. Any patent does for that matter. As this court said in In Re Dem Bisic, the best defense against subtle, but the powerful attraction of hindsight bias, obviousness is rigorous application of showing of teaching or motivation to combine prior art references. Here the board simply brushed aside Mr. Pinkston's life work, and it should be reversed. Thank you, counsel. The case is submitted.